**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

EMILY M. BALLEW                                      Case No. 1:08cv490

    Plaintiff,                                      Judge Michael R. Barrett

vs.

W.D. LARSON COMPANIES
LTD., INC., et al.

    Defendants.

## ORDER

This matter is before the Court on a Plaintiff's motion for partial summary judgment (Doc. 30) and Defendant's motion for summary judgment (Doc. 31). Both motions are opposed and have been fully briefed. Also pending is Plaintiff's motion for leave to cite supplemental authority (Doc. 55). This motion is DENIED as moot. The Court is aware of the case citation referred to in the motion and will give it equal consideration as it does with all relevant caselaw.

I.     RELEVANT BACKGROUND FACTS

Plaintiff's second amended complaint alleges claims for defamation and gender discrimination in violation of O.R.C. Chapter 4112 (Doc. 27). Defendants filed a counterclaim alleging breach of contract and breach of duty of loyalty.

In 2005, Plaintiff, Emily Ballew, was hired as a truck salesperson to work at a Peterbilt truck dealership in Cincinnati, Ohio. The dealership is owned and operated by W.D. Larson Companies LTD., Inc. (hereinafter "Larson"). In 2007, Robert Shannon was hired as the general manager in charge of the Cincinnati dealership, including supervising

Ballew. At the time Shannon lived in Wisconsin and only visited the dealership several times each month. He also used the telephone and email to keep in touch with his employees. When Shannon first met Ballew, he stated to her, "you must be the medium duty girl." Ballew took this statement as an indication that Shannon believed that women could only sell medium duty trucks and not the heavy duty trucks. However, Ballew never complained about this statement nor did she seem to be offended by it at the time.

On April 10, 2008 Jason Beatty, an employee of Beamer Brothers, came to the dealership to purchase a headache rack . The cost of this headache rack was $200. Bob Pitcher was working in the parts department at that time and was relatively new to the position. Due to circumstances that are not relevant here, Pitcher was not sure how to apply the $200 cash and refused to accept it. Ballew states that she agreed to take the money until Pitcher figured out where it belonged. Beatty gave Ballew the money in front of Pitcher, and possibly others. Beatty was then given the headache rack and a receipt for his payment of $200 which consisted of two one-hundred dollar bills. Ballew took the money, placed them in her jacket pocket, and returned to work.

The next day Pitcher worried that he would be held accountable for the money if Ballew did not turn it in. Instead of asking Ballew about the money, he went to Jodi Robinson, the office manager, who then told Shannon that Ballew sold a headache rack and did not turn in the money. Shannon told Robinson he would take care of it and not to take any further action. No one discussed the money with Ballew until Shannon called her into his office on April 23, 2008. Shannon had not investigated the matter and testified that he was told that a headache rack was sold by Emily and that "it was observed by a parts counterman that she just put the money in her pocket and walked away." (Shannon Dep.,

2

p118). Once Ballew entered his office, he immediately accused her of stealing the $200 and did not ask her any questions about it. Ballew was caught off guard and was not sure what he was talking about at first. She then remembered about the $200 headache rack transaction. She had put the money into her jacket pocket and then forgot that it was in there. When pressed as to its location, she obtained her jacket from her car and retrieved the very same two one-hundred dollar bills. Although Ballew states that she was waiting for Pitcher to give her instructions as to what to do with the money, she admits that she also failed to follow up on the matter because her husband got sick. Shannon then terminated her for breaking the trust since he believed she had stolen the money.

Shannon then informed Robinson that Ballew was terminated and directed her to watch Ballew pack her things. Robinson then watched as Ballew packed her things and, according to Ballew, then said to Ballew that she could not believe they were accusing her of theft and that she would not put that in Ballew's paperwork as for the reason for her termination. Robinson denies making such a statement.

Shannon denied telling Robinson or anyone else why Ballew was terminated. Robinson also states that Shannon did not give her a reason for Ballew's termination. However, shortly after her termination, Gary Meyer, a parts employer at Larson's Erlanger Kentucky dealership, had been told by two different employees from the Cincinnati location, that Ballew was fired for stealing money. Roger Murray, a part-time driver for Larson, testified that he told Andy Brady, a service technician, that Ballew was fired for theft. Murray could not recall who told him why Ballew was terminated but was sure that it was not Shannon.

In June 2008, Ballew was hired by Beamer Brothers as a heavy-duty equipment

3

salesperson. Beamer Brothers knew the alleged reason for her termination at the time of her hiring. Then in December she took another job as the Heavy Duty Truck Manager at ADESA in Lexington, KY. During this time that Ballew was working for ADESA, Larson hired Roy Vaughn as part of its acquisition of Tri-State Sterling Trucks, Inc. where Vaughn worked. Vaughn then became the Used Truck Manager for Larson. During a conversation with Jimmie Jackson, the Heavy Duty Truck Manager at ADESA in Atlanta, GA, Vaughn told Jackson that Ballew was fired from Larson for stealing. Vaughn testified that Lee Sanregret, another salesperson at Larson, told him Ballew was fired for stealing.

Prior to Shannon calling Ballew into his office regarding the missing money, he had sent her an email asking her to "immediately leave." He sent this email because Ballew had brought her son to work with her. She had to bring her son to work with her for a few hours since her husband is disabled and was in the hospital during this time period. Larson does not have a policy that forbids bringing children to work and other employees have brought their children to work on other occasions without incident or reprimand. Her son did not cause any distractions or disruptions while he was there.

While employed at Larson, Ballew was paid on a "monthly draw" that was applied to the comissions she earns from her sales. At the time of her termination, her draw had a negative balance of approximately $9,768.22. Larson alleges that Ballew owes it the balance of her draw that her commissions did not cover. Larson also alleges that Ballew worked for a competitor while employed at Larson.

II. LEGAL ANALYSIS

    A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986). The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252.

"In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also *L.S. Heath & Son, Inc. v. AT&T Information Sys., Inc.,* 9 F.3d 561 (7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir.), cert. denied, 506 U.S. 832, 121 L. Ed. 2d 59, 113 S. Ct. 98 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ..."). Thus, a

court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties." *Beatty v. UPS,* 267 F. Supp. 2d 823, 829 (D. Ohio 2003).

    B.  <u>Defamation</u>

  Defamation is the unprivileged publication of a false and defamatory matter made by one about another which tends to cause injury to a person's reputation or exposes him to public hatred, contempt, ridicule, shame or disgrace or affects him adversely in his trade or business. *McCartney v. Oblates of St. Francis deSales*, 80 Ohio App. 3d 345, 353-355 (Lucas Cty. 1992). There are two types of defamation: per se and per quod. *Id.* Defamation per quod is determined by the interpretation of the listener, through innuendo, as between an innocent or harmless meaning and a defamatory one. Per se means that the defamation is accomplished by the very words spoken and "must consist of words which import an indictable criminal offense involving moral turpitude or infamous punishment, imputes some loathsome or contagious disease which excludes one from society or tends to injure one in his trade or occupation." *Id. See Schoedler v. Motometer Gauge & Equip. Co.*, 134 Ohio St. 78, 84, 15 N.E.2d 958, 960 (1938). "If the statements are found to be actionable per se, both damages and actual malice are presumed to exist." *Id.* (internal citations omitted).

  To prevail on a defamation claim, a plaintiff must prove the following elements: (1) a false statement, (2) about the plaintiff, (3) published without privilege to a third party, (4)

6

with fault or at least negligence on the part of the defendant, and (5) that was either defamatory per se or caused special harm to the plaintiff. *McPeek v. Leetonia Italian-American Club*, 174 Ohio App. 3d 380, 384 (Columbiana Cty. 2007) *citing Gosden v. Louis*, 116 Ohio App.3d 195, 206 (1996). "[I]n private-figure defamation actions, where a prima facie showing of defamation is made by a plaintiff, the plaintiff must prove by clear and convincing evidence that the defendant failed to act reasonably in attempting to discover the truth or falsity or defamatory character of the publication." *Id.* at 385, *quoting Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St.3d 176, 180, 512 N.E.2d 979 (1987).

However, under Ohio law a defense of qualified privilege to allegations of defamation exists where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it. *Hahn v. Kotten*, 43 Ohio St. 2d 237, 243 (Ohio 1975). Once a defendant demonstrates the existence of a qualified privilege, the plaintiff can only prevail upon a showing of actual malice. *Evely v. Carlon Co., Div. of Indian Head, Inc.*, 4 Ohio St. 3d 163, 165-166 (Ohio 1983); *McPeek v. Leetonia Italian-American Club*, 174 Ohio App. 3d 380 (Columbiana Cty. 2007). *See also Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 460-461 (6th Cir. 2004). "Actual malice" is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity. *Jacobs v. Frank,* 60 Ohio St. 3d 111, 116 (Ohio 1991); *McPeek*, 174 Ohio App. 3d at 385.

Ballew alleges that Shannon told Robinson, and possibly others, that she stole money and was terminated for theft. (See, Doc. 27, ¶¶45, 48 - 49, 58). She also alleges that Shannon and/or Robinson told lower level employees the same thing and that Vaughn

7

told Jimmie Jackson as well. (See, Doc. 27, ¶¶52, 58). Shannon and Robinson both deny making such a statement and, although Vaughn admits to stating that he heard Ballew was terminated for stealing, Larson argues that such a statement is not defamation.

Based upon the deposition testimony of Ballew and Pitcher as well as the Affidavit of Jason Beatty, it is clear that there is a question of fact as to whether or not the alleged statement is true, i.e., whether Ballew stole money from Larson. Also, no one disputes that the statements, if made, are about Ballew.

The third element, whether or not the statements were published, without privilege, to a third party, is contested. Shannon states that he did not tell Robinson, or anyone else, that Ballew stole money and was terminated for theft. He testified that he told Robinson that Ballew was terminated for breaking the trust.[1] In contrast, Robinson testified that Shannon did not give her a reason for Ballew's termination. Despite the disparity, neither state that they said Ballew stole money. However, Ballew states that Robinson said to her "I can't believe they accused you of theft" and asserted that she would not put on her dismissal paperwork that theft was the reason for her termination. Robinson denies making such a statement. Ballew argues that since Shannon was the only person who knew the reason for which he terminated Ballew that the information that she had been fired for stealing had to have originally come from Shannon. Larson argues that since there is no evidence that Shannon made such a statement that Ballew's position requires an inference that was rejected in *Wyrick v. Westover Retirement Community*, Co. 88-06-

---

[1] Shannon admits to telling three other managers, via email and subsequently on the phone, that Ballew was fired for breaking the trust. However, those individuals are not located in Cincinnati and Ballew does not seem to have an issue with the emails or phone calls.

8

086, 1989 WL 21229 (Ohio App. Mar. 13, 1989). In *Wyrick* the inference to be made was to infer that people heard the comment that was made simply because the comment was made in a dining hall with other people present. No evidence was presented that anyone actually heard the comment. Here the evidence is clear that at least lower level employees and Vaughn told others that Ballew was fired for stealing money and there is evidence that others heard such a statement. *Wyrick* is distinguishable because the inference to be made here is as to who, on behalf of Larson, first made the statement, not whether or not someone heard the statement. The question is, where did the lower level employees hear that Ballew was terminated for stealing money. Ballew wants the trier of fact to infer that it came from Shannon.

This Court finds that it is a question of fact for a jury to determine since Shannon was the only person who knew why he terminated Ballew, especially given since over two weeks had passed since Pitcher mentioned the headache rack transaction to Robinson who in turn mentioned it to Shannon. No other mention of the headache rack transaction had been made in those two weeks. In addition, since Ballew had already been reprimanded that day for bringing her child to work it is reasonable for a the lower level employee to think she had been terminated for that reason unless someone specifically said that she was fired for stealing. Furthermore, Robinson's deposition testimony seems to conflict with not only Ballew's testimony but also Shannon's. A reasonable jury could determine that the statement that she was terminated for theft, or even the statement she was terminated for breaking the trust, spread too quickly for no one in management to have said anything to anyone in that regard. Thus, there is a question of fact as to whether or not a statement was published.

The second part of this element requires the Court to consider if the published statement, if made, was privileged. Larson argues that it was. Any statement from Shannon to Robinson would likely be privileged due to Robinson's position as office manager. However, any statements to lower level employees would likely not be so privileged. If a privilege exists, then Ballew must show actual malice by clear and convincing evidence. *Jacobs v. Frank*, 60 Ohio St. 3d 111, 116 (Ohio 1991). If no privilege exists, she only must show that the defendant failed to act reasonably in attempting to discover the truth or falsity of the publication. *Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St. 3d 176, 181 (Ohio 1987). The Court does not need to reach the issue of privilege because Ballew has shown an issue of fact as to actual malice. "Actual malice" is defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity. *Jacobs v. Frank*, 60 Ohio St. 3d 111, 116 (Ohio 1991). The standard for reckless disregard "is a subjective one -- there must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of . . . probable falsity.'" *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 688 (1989) citing *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).

Ballew argues that not only is the statement that she stole money a complete fabrication but that the lack of any investigation whatsoever of the underlying facts shows that Shannon and/or Robinson acted with reckless disregard as to whether or not the statement was false. There is enough evidence to create an issue of fact here. Shannon admitted that he did nothing to investigate the matter and took Robinson's second hand recitation of the limited facts that she knew at face value. Alone, this statement may not

be enough to prove reckless disregard. See *Hart-Hanks Communications*, 491 U.S. at 688. However, when Ballew turned in the same two one hundred dollar bills that were entrusted to her two weeks earlier, a jury could determine that Shannon had, or should have had, a high degree of awareness that she did not steal the money. Moreover, Robinson had no first hand knowledge of the transaction and failed to do any investigation before or after she passed on the information to Shannon.

Finally, although Larson attempts to argue to the contrary, the statements are defamatory per se as they import an indictable criminal offense involving moral turpitude and tend to injure Ballew in her trade or occupation. The statement is not one subject to an interpretation.

Now addressing the statements made by Vaughn, Ballew argues that Vaughn was in a managerial position and that his statement to Johnson, that he heard Ballew was terminated for theft, is a separate slanderous statement made by or on behalf of Larson. Larson argues that Vaughn was not acting within the scope of his employment and that he was giving a "heads up" to a friend's son. The conversation between Vaugh and Johnson took place during a business called placed by Vaughn to Johnson wherein Vaughn inquired about a truck and then was directed to contact Ballew. A reasonable jury could determine that this was a statement made within the scope of his employment.

Larson also argues that since Vaughn was told that Ballew was fired for stealing that Vaughn's statement "I heard she was fired for stealing" is not false since that is, in fact, what he heard. A jury could reasonably view the statement as defamatory even though Vaughn added "I heard" before he reiterated the alleged defamatory statement. Such a statement implies to the listener that it is true, especially given that Vaughn works at

11

Larson. It is logical for one to assume that Vaughn heard accurate information and was passing along the same. Larson also argues that since Vaughn came to work at Larson long after Ballew and Shannon were gone that he had no duty to inquire into the truth or falsity of the statement. Larson does not cite any case law to support this position and the Court finds that there is a question of fact relating to whether he had such a duty. Finally, Larson argues that the statement was not defamatory per se thus requiring Ballew to show special damages. The Court disagrees. As set forth above, the statement is defamatory per se. Adding "I heard" before it does not make it any less so.

      C.      Gender Discrimination

To establish a prima facie case of gender discrimination, the employee must show that 1) she was a member of the statutorily-protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position; and 4) she was replaced by, or her discharge permitted the retention of, a person not belonging to the protected class. *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668.

Once a prima facie case of gender discrimination is established, the employer may overcome the presumption by coming forward with a legitimate, nondiscriminatory reason for the discharge. *Goodyear v. Waco Holdings, Inc.*, 2009 Ohio 619, P32-P33 (Ohio Ct. App., Cuyahoga County Feb. 12, 2009) *citing Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 575 N.E.2d 439. The employee must then present evidence that the employer's proffered reason was a mere pretext for unlawful discrimination. *Id. citing Manofsky v. Goodyear Tire & Rubber Co.* (1990), 69 Ohio App.3d 663, 668, 591 N.E.2d 752. The employee's burden is to prove that the employer's reason was false and that discrimination

12

was the real reason for the discharge. *Id. citing Wagner v. Allied Steel & Tractor Co. (1995), 105 Ohio App.3d 611, 617, 664 N.E.2d 987.*

Larson argues that Ballew can not establish a prima facie case of gender discrimination because she was not replaced by someone outside the protected class. Larson argues that it did not hire anyone to replace Ballew and that Ballew can not show that a comparable non-protected person was treated better than she was.

Larson argues that it did not replace Ballew but instead distributed Ballew's accounts to the remaining sales people, namely, Lee Sanregret, Don Zwosta and Lyle Monroe. Ballew argues that she was replaced by Zwosta who was a sales person at the Erlanger location. According to Larson, there were plans to close the Erlanger location and to that end Zwosta was moved from Erlanger to Cincinnati. However, very shortly thereafter, the decision was made to keep Erlanger open and Zwosta was moved back to that location. Larson argues that at no time did Zwosta replace Ballew and at all times, whether he was in Erlanger or in Cincinnati, his sales were managed and run through the Cincinnati location.

However, even assuming that Ballew can show a prima facie case of gender discrimination and that Larson can establish a legitimate business reason for its decision to terminate Ballew, Ballew can not establish that the proffered reason, i.e., that she stole money or that "she broke the trust," was pretext for gender discrimination.

To establish pretex the burden is on Ballew to show either that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse action, or (3) the proffered reason was insufficient to motivate the adverse action. *Manzer*

*v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).[2] "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Unsupported speculation cannot form the basis for demonstrating pretext. *See Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 623 (6th Cir. 2003). Even if the Court assumed that the reason for Ballew's termination was false, she has presented no evidence that gender discrimination was the real reason. Ballew offered one statement made by Shannon in late 2007, four months prior to her termination, wherein Shannon stated to Ballew that "you must be the medium-duty girl." Ballew interpreted this statement to be offensive in that he did not think that women could sell heavy-duty trucks. This one statement made months prior to her termination is insufficient to show that gender discrimination was the real reason for her termination. There is no evidence that this statement, made months earlier, contributed to her termination.

Additionally, Ballew's only other evidence to support her pretex argument is that, on the morning of her termination, Shannon told her, via email, to leave the office because she brought her son to work with her. Ballew suggest that other employees had previously brought their children to work with them without problems and that there is no official company policy prohibiting the bringing of children to work. However, Ballew fails to present evidence that any of these employees brought their children to work while

---

[2]The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981).

Shannon was on site as the general manager. Shannon testified that he was not aware of any other employees bringing their children to work. Ballew has failed to show that this was reprimand was connected in any way to her gender.

Thus, Plaintiff's gender discrimination claim fails.

### D. Breach of Contract.

While employed at Larson, Ballew was paid on a "monthly draw" that was deducted from the commissions she earned from her sales. At the time of her termination, her draw had a negative balance of approximately $9,768.22. Larson alleges that Ballew owes Larson the balance of her draw that her commissions did not cover. However, in Ohio, an employer can not recover a draw paid to a commissioned employee unless the parties specifically agree that the draw would be recoverable if it exceeded the commissions earned at the time the employee separated from the employer, either voluntarily or involuntarily. *See Miller v. Levy*, 60 Ohio App. 2d 78, 80-81, 395 N.E.2d 509 (Franklin Cty. 1978); *Marburger v. Eastwood Chrysler-Plymouth*, 71 Ohio App.2d 22, 225, 593 N.E. 2d 351 (Trumbull Cty. 1991). No evidence has been presented that there was ever an agreement that the draw would be repaid. In fact, the evidence shows that the matter was never discussed. Shannon testified that he and Ballew discussed that she was behind and she responded that she would get caught up. Larson also argues that the fact that it provided Ballew with a spreadsheet that would show the balance of the draw compared to Ballew's commissions, whether negative or positive, shows that an implied agreement existed. This evidence is not sufficient to not support their claim. There was no agreement, implied or otherwise, thus, Plaintiff's motion for summary judgment on this claim is hereby GRANTED.

E.  Breach of duty of Loyalty

Larson argues that Ballew beached a duty of loyalty owed to it when she worked for a truck wholesaler named Rodney Pack on company time and using company resources. Pack's Auto Sales buys and sells trucks and other equipment all over the country. Pack uses independent contractors to run his dealerships, move equipment, and buys and sell equipment. Prior to working at Larson, Ballew worked for Pack and she continued to do so, to a lesser extent, after she started working for Ballew. Ballew argues that her work with Pack was fully known to Larson from the very beginning and that Larson did not object to it. This is supported by the Affidavit of Pack. Furthermore, Ballew argues that her work with Pack was not in competition with the business of Larson. However, Edwards testified that he did not know that she continued to work for Pack and that he considered Pack to be a competitor. Based on the conflicting testimony, it is clear that a question of fact exists. Thus, the motion for summary judgment as to this claim must be denied.

III.  Conclusion

Based upon the above discussion, Defendant's motion for summary judgment is GRANTED, in part, and DENIED, in part. Plaintiff's motion for partial summary judgment is GRANTED, in part, and DENIED, in part.

**IT IS SO ORDERED.**

*s/Michael R. Barrett*
UNITED STATES DISTRICT JUDGE